590 A.2d 790

**PITTSBURGH COAL AND COKE, INC., Appellant,**

**v.**

**Fred A. CUTERI, Cuteri Holding Company, Eureka Energy Company, Coldren, DeHaas & Radcliffe, Ira B. Coldren, Jr., Ralph K. Barclay, Jr., Ernest P. DeHaas, III, William M. Radcliffe, and Bernard B. Klein, Appellees.**

Superior Court of Pennsylvania.

Argued Jan. 9, 1991.

Filed May 3, 1991.

</div>

300

Harlan S. Stone, Pittsburgh, for appellant.

Kathryn L. Simpson, Pittsburgh, for appellees.

Before TAMILIA, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Fayette County (per Judge J. Quint Salmon, Specially Presiding) granting the preliminary objections in the nature of a demurrer of the Appellees/co-Defendants [1] resulting in their dismissal from the lawsuit

---

1. The Appellees consist of the law firm of Coldren, DeHaas and Radcliffe and its partners, Ira. B. Coldren, Jr., Ralph K. Barclay, Jr., Ernest P. DeHaas, III, William M. Radcliffe, and Bernard B. Klein (hereinafter referred to as "Coldren law firm" or "Appellees").

The appeal perfected by the Appellant is properly before this Court inasmuch as the Appellees, as co-Defendants, were removed from the suit with the grant of their preliminary objections. Cf. *Chiricos v. Forest Lakes Council, Boy Scouts of America*, 391 Pa.Super. 491, 571 A.2d 474 (1990). The Appellant is "out of court" as to its causes of action premised on professional negligence and fraud against the Appellees. Cf. *Consul v. Burke*, 403 Pa.Super. 400, 589 A.2d 246 (1991) (Order granting preliminary objections of additional defendants to their joinder in suit was appealable by original defendants).

instituted by the Plaintiff/Appellant, Pittsburgh Coal and Coke, Inc. We affirm.

On November 27, 1984, Eureka Energy Company agreed to purchase equipment from Pittsburgh Coal and Coke, Inc. By agreement of even date, Cuteri Holding Company also contracted to purchase real estate from Pittsburgh Coal and Coke, Inc. In each instance, Fred A. Cuteri signed documents "unconditionally guarantee[ing]" that both entities would perform under the provisions of the November 27th agreements. Failing this, Cuteri consented to have Pittsburgh Coal and Coke, Inc. commence suit against him "without having commenced any action or having obtained any judgment against Cuteri."

When it appeared that non-compliance with the November 27th agreements was imminent, a 45–day extension was granted by Pittsburgh Coal and Coke, Inc. to Cuteri[2] on August 27, 1985. Cuteri, as security for the performance of the August 27th agreement (hereinafter referred to as the "Escrow" agreement), placed in escrow deeds to three parcels of property situated in this Commonwealth. Upon default, Pittsburgh Coal and Coke, Inc. received what purported to be title to Cuteri's one-half interest to these properties, the remaining share of which belonged to a Richard DiCenzo, his business associate. The deeds were drafted and a "lien search" of the real estate was conducted by the Coldren law firm, the latter of which was communicated to counsel for Pittsburgh Coal and Coke, Inc. in letter form and read in pertinent part:

This is to confirm that we made a lien check with respect to Fred A. Cuteri, Fred A. Cuteri, Jr., Rinaldo DiCenzo and Richard DiCenzo.

We found no mortgages indexed against any of the parties. The only liens which we found were municipal liens entered against two properties ... which DiCenzo and Cuteri conveyed to Pittsburgh Coal & Coke. Neither

2. Under the terms of the August 27, 1985, agreement, "Cuteri" included Fred A. Cuteri, Fred A. Cuteri, Jr., Cuteri Holding Company, and Eureka Energy Company.

of these liens has anything to do with the property to be held in escrow for the benefit of Pittsburgh Coal & Coke.

When Pittsburgh Coal and Coke, Inc. decided to sell its interest in the properties, a "title search" was conducted by the prospective buyer[3] who learned that Cuteri had transferred his interest in the property to a partnership comprised of Cuteri and Richard DiCenzo by deed dated June 11, 1984, a deed prepared by the Coldren law firm.

A 6–count complaint was filed by Pittsburgh Coal and Coke, Inc. alleging, *inter alia,* fraud and professional negligence on the part of the Coldren law firm and its partners in drafting deeds, pursuant to the Escrow agreement, conveying what appeared to be Cuteri's one-half interest to property when it "knew" that "Cuteri no longer had good title to this real estate." Count V, Paragraph 24.

Preliminary objections in the nature of a demurrer (to Counts III, IV, V & VI) and a motion to strike (as to Counts III, IV, V and a request for attorneys fees) were filed on behalf of the Coldren law firm. A brief was submitted thereafter in which the allegations of professional negligence were refuted because of the absence of privity and an attorney-client relationship between the Appellant and the Appellees. As for the commission of fraud by the Coldren law firm, for allegedly "knowing" that Cuteri did not have good title to the property pledged as collateral on the Escrow agreement and "misleading" the Appellant by delivering deeds purportedly transferring title which Cuteri did not have to convey "after" it drafted a deed conveying title away from Cuteri, it was asserted at page 6 of Coldren's pre-trial brief that:

> By [the Appellant's] definition of fraud, any attorney called upon to prepare a deed for a client would be required to do a title search not only before doing the deed but up until the time the deed was utilized because,

---

**3.** Of interest is the reference by the Appellant in its complaint at Paragraph 12 that Richard DiCenzo was the proposed buyer, a named associate of Cuteri and a half owner of the properties sought to be sold.

after preparing and delivering the deed to the client, another deed could be recorded [prior in time] that would make the deed prepared by the attorney useless.

After taking the matter under consideration, the court granted the preliminary objections of the Coldren law firm. This resulted in the Coldren law firm being removed from the law suit as a party-defendant. This appeal followed and raises three issues for our review, the first two of which can be consolidated into the query: "Did the court err in sustaining the preliminary objections in the nature of a demurrer of the Appellees?"

■ Since this is an appeal from the sustaining of a demurrer, we accept as true all well-pleaded material facts set forth in the complaint as well as all inferences reasonably deducible therefrom. *Dercoli v. Pennsylvania National Mutual Insurance Co.*, 520 Pa. 471, 554 A.2d 906 (1989).

■ It is the Appellant's position that it has stated a cause of action for professional negligence against the Appellees consistent with the Supreme Court's decision in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983), which noted that a party:

... must show an attorney-client relationship or a specific undertaking by the attorney furnishing professional services ... as a necessary prerequisite for maintaining [a suit.]

Id., 501 Pa. at 58, 459 A.2d at 750. More specifically, the Appellant contends that, despite the absence of a formal attorney-client relationship between itself and the Appellees, "[t]he facts, as alleged, clearly support imposing such a duty" under *Guy's* "alternate theory that special circumstances or a specific undertaking may impose that duty." Appellant's Brief at 16. In support, the Appellant cites *Lawall v. Groman*, 180 Pa. 532, 37 A. 98 (1897), for an illustration of how a duty arises absent the usual attorney-client relationship.

*Lawall* involved an appeal from the trial court's refusal to remove a non-suit for the Plaintiff's failure to prove an attorney-client relationship between herself and the Defendant/attorney.

The Supreme Court reversed the trial court's judgment in favor of the Defendant. In the course of doing so, the Court observed that the establishment of an attorney-client relationship was not based solely on compensation for services being paid by the party charging an attorney with professional negligence. Nor was such remuneration indispensable to the creation of a representative status. Rather, the facts needed to be examined to decide whether the relation of attorney and client arose from the "mutual understanding" of the parties. As stated by the Court:

> In the present case it is undeniable that the defendant was acting for Roberts, the borrower, from whom he received his compensation, and to whom alone, upon the manifest understanding of all parties, he was to look for it. But that fact does not of itself prevent the relation of attorney and client between plaintiff and defendant, if such was the mutual understanding. There was no evidence of custom in that respect, and the court below might not be able to say, as matter of law,—certainly we cannot,—that such was in fact the custom. But, outside of the existence of any general rule, there was evidence from which the jury might have inferred that such was the understanding of these parties in this particular case. The defendant unquestionably acted to some extent for and in behalf of the plaintiff. After the money was paid over, he kept the mortgage, which was then the property of plaintiff, and he put it on record. In so doing he was clearly acting for plaintiff, and, if he had negligently delayed recording until a subsequent judgment or other incumbrance [sic] slipped in ahead of it, there can be no question that he would have been liable for the negligent performance even of a duty voluntarily assumed. But there was evidence that he did more for plaintiff than put the mortgage on record. Lawall testified that he [sic]

told defendant "to search the title and the records in reference to liens," and that "he said he would," and more to the same effect. The presumption is that this was done in behalf of plaintiff. To Roberts, the borrower, the priority of other incumbrances [sic] was of no concern, with regard to this loan, except as bearing on plaintiff's willingness to advance the money; but to plaintiff it was a material fact, as part of the inducement or consideration for risking the investment. We are of opinion, therefore, that there was sufficient evidence to submit to the jury on the existence of the relation of attorney and client in the case.

But the nonsuit was also erroneous for another reason. Independent of the relation of attorney and client, there was evidence, already noticed, that defendant undertook certain duties for the plaintiff. The learned judge rightly says that collusion or fraud could not be found, on the evidence in the case, but this does not exclude liability arising from negligence. The principle settled in Coggs v. Bernard, 1 Smith, Lead.Cas. 369, that one who undertakes to do, even without reward, is responsible for misfeasance, though not for nonfeasance, has been generally adopted. If, therefore, defendant, knowing that plaintiff was relying on him, in his professional capacity, to see that her mortgage was the first lien, although Roberts was to pay the fees, undertook to perform that duty, he was bound to do it with ordinary and reasonable skill and care in his profession, and would be liable for negligence in that respect.

180 Pa. at 539–40, 37 A. at 98–99. Thus, in *Lawall* we had an attorney undertaking to perform a specific service for a third party, the reliance of that third party and the attorney's knowledge of that reliance justifying the institution of a lawsuit.

Additionally, the concept of third-party beneficiary status being accorded to an individual not in privity with or under contract for the services of an attorney was endorsed by the Court in *Guy v. Liederbach*, supra, to allow an intended

beneficiary to sue the scrivener of a will, which she witnessed at his direction and resulted in the loss of her entire legacy as a result thereof.

At bar, we need not inquire whether the Plaintiff should be permitted to bring suit under *Guy's* third-party beneficiary theory since the facts, as alleged and given every inference fairly deducible therefrom,[4] indicate that the Coldren law firm performed professional services on behalf of Pittsburgh Coal and Coke, Inc. See "no lien" letter, Exhibit "H", R. 57; note 4, supra. As a result, under *Lawall*, we need only determine whether a "specific undertaking" took place with regard to the Coldren law firm on behalf of the Plaintiff and was articulated with sufficient specificity to survive preliminary objections. See *Guy v. Liederbach*, supra.

The first we learn of the Appellees' involvement in the case is with Paragraph 10 of the Plaintiff's complaint, which avers that the Coldren law firm conducted a "lien search" of the real estate which became one of the prongs of the lawsuit. Once the services were performed, the completion of the same and the findings were communicat-

4. Paragraph 10 of the Plaintiff's complaint makes reference to a lien search conducted by the Coldren law firm on the real estate in question. It indicates that the results of the lien search were communicated to Plaintiff's counsel in letter form appearing as Exhibit "H" in the record and reproduced supra. The letter, read in a light most favorable to the Plaintiff, reveals that the Appellees embarked on the performance of a task (lien search) and were reporting their findings to the Plaintiff.

Because this search was to the benefit of the Plaintiff, of which the Appellees could be deemed to be aware, it is reasonable to infer that the conduct of the Appellees was initiated at the behest of the Plaintiff (be it directly or via counsel for the Plaintiff). Thus, we find that *Lawall's* approval of a suit against an attorney for engaging in "a specific undertaking" for the complainant is apposite instantly to permit scrutiny of the alleged claims of malpractice.

Under the circumstances as stated, we perceive no reason why Cuteri would have prompted the lien search since it would have been to the benefit of the Plaintiff to assure itself that the collateral was not encumbered. Thus, it would appear plausible that the Plaintiff caused the lien search to be conducted and reported to it in the August 28, 1985, letter by the Coldren law firm. Cf. *York Federal Savings and Loan Association v. Crider*, 18 Adams County L.J. 7 (1976).

ed to counsel for the Plaintiff by letter, *i.e.*, "no mortgages or liens" affecting any of the property held in escrow for the benefit of the Plaintiff were uncovered.

In the remaining paragraphs of the complaint, in particular 12 and 21 through 26, the Plaintiff contends that the Coldren law firm committed fraud and malpractice in the manner in which it performed its role, characterized by the Plaintiff as a "duty" owed by the Appellees not to prepare invalid deeds listing Cuteri as title owner to property used as collateral in the Escrow agreement.

■ We begin with the observation, as did the court below, that there is a distinction between the scope of a "lien" search *vis-a-vis* a "title" search. Each seeks to uncover distinct information. For example:

> In its broadest sense and common acceptation, a lien is understood and used to denote a legal claim or charge on property, either real or personal, as security for the payment of some debt or obligation. It has also been described as a hold or claim which one person has on the property of another as a security for some debt or charge, although the property is not in the possession of the one to whom the debt or obligation is due.

53 C.J.S., *Liens*, § 2 (1987) (Footnotes omitted). Thus, when one conducts a "lien" check, he is attempting to ascertain whether a piece of personal or real property is charged with the payment of a debt. Id. at 456. In contradistinction, a "title" search is more encompassing and, on occasion, entails the issuance of title insurance indemnifying the insured against loss occasioned by "a defect of title to real estate wherein the insured has an interest either as a purchaser or otherwise." 43 Am.Jur.2d, *Insurance*, § 2 (1982).

In an attorney-client context:

> An attorney employed to examine title to real or personal property must exercise reasonable care and skill in the matter, and the failure to do so is negligence for which he will be liable to his client in damages if his client

is injured. This principle is applicable whether the examination is for a prospective purchaser, or a prospective lender.

An attorney employed to examine title may be held liable for negligence in the determination of the amount of location of real property, or in the determination of a seller's or mortgage's title. He must not overlook encumbrances such as mortgages or judgments or liens. Unless there is an understanding to the contrary, the title search must be carried forward to the time of closing title.

An attorney in examining and reporting on a title is not a guarantor. He only undertakes to bring to the discharge of his duty a reasonable skill and diligence, and he is not liable for making a mistake with respect to a doubtful question of law.

7 Am.Jur.2d, *Attorneys at Law*, § 207 (Footnotes omitted).

From the preceding it becomes evident that a title search includes a search for liens, in addition to uncovering the presence or absence of mortgages, judgments *and a determination of a seller's or mortgagor's title*. Therefore, although a title search extends itself to encompass a search for liens, the converse is not true. A lien search only seeks to discover whether property is charged with the payment of a debt and is not preoccupied with tracing one's title-ownership to property back to its date of origination, *e.g.*, land-grant date up to the time of closing—euphemistically referred to as "chain of title". Black's Law Dictionary 290 (Revised 4th ed. 1986).

Interestingly enough, it appears, at least facially, that this distinction is recognized by the Plaintiff in its pleadings. See Complaint, Paragraphs 10 and 12, wherein it is alleged that the Coldren law firm conducted a "lien search" of the real estate in question, whereas a "title search" conducted by a prospective buyer disclosed the absence of legal title to the same in Cuteri.

■ Therefore, we find that the Coldren law firm did exactly what it appears it was required to do in notifying the Plaintiff of having performed a "lien" check of the property. In doing so, the Appellees engaged in a "specific undertaking ... [to] furnish[ ] professional services" to the Plaintiff consistent with *Lawall,* supra. See *Guy v. Liederbach,* supra, 501 Pa. at 57, 459 A.2d at 750. However, the "duty" attendant to this search by the Appellees in no sense can be broadened to incorporate a legal obligation to advise the Plaintiff of a defective title to property used as collateral for the Escrow agreement. This information would have manifested itself only if the Appellees were engaged to perform a title search by the Plaintiff. See *Lawall,* supra. Because of the absence of this fact, the Plaintiff has failed to establish a breach of the Appellees' legal duty to it, and, as such, no amount of amendatory pleading will salvage the malpractice/negligence cause of action. See Count VI, Paragraph 26; contrast *MacGregor v. Mediq, Inc.,* 395 Pa.Super. 221, 576 A.2d 1123, 1126 (1990).

■ The same result obtains with regard to the Plaintiff's allegations of fraud; *viz.:*

## COUNT IV

21. ...

22. Upon information and belief, P[ittsburgh] C[oal and] C[oke] alleges that [the Coldren law firm] knew that Cuteri did not have good title to the Buildings and the Mount Braddock Property in preparing the deeds which conveyed his interest in this property pursuant to the Escrow Agreement. [The Coldren law firm] knowingly and maliciously committed fraud in concealing this material fact and thereby injured PCC in the amount of $360,000.

## COUNT V

23. ...

24. Upon information and belief, PCC alleges that Cuteri, Eureka, and C[uteri] H[olding] C[ompany] knowingly and maliciously agreed with [the Coldren law firm] to defraud PCC by preparing invalid deeds for the Buildings and the Mount Braddock Property and by concealing from PCC the fact that Cuteri no longer held good title to this real estate. PCC suffered injury in the amount of $360,000 as a result of this unlawful conspiracy.

No one contests the fact that the June 11, 1984, deed, transferring Cuteri's one-half interest in the properties in question to the partnership of Richard DiCenzo and Fred A. Cuteri, had been filed and of record with the Recorder of Deeds Office for the public at large to take note and examine. See R. 58. In light of such a fact, we would be hard pressed to find that the Appellees engaged in a "concealment of a material fact" which proved detrimental to the Plaintiff. Accordingly, we deem it proper to affirm the action of the court in granting the Appellees' preliminary objections in the nature of a demurrer.[5]

Order affirmed.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting.

I agree with my colleagues that the averments contained in the complaint filed by Pittsburgh Coal & Coke, Inc. (P.C.C.) against Coldren, DeHaas & Raclifee and its partners (the Coldren firm) fails to set forth a cause of action upon which relief can be granted. Pa.R.C.P. 1017(b)(4). *Balsbaugh v. Rowland,* 447 Pa. 423, 290 A.2d 85 (1972). I would also agree that P.C.C. has failed to aver fraud with particularity as required by Pa.R.C.P. 1019(b).

---

**5.** The third issue proffered by the Appellant challenges the court's failure to afford it the opportunity to amend its complaint. We find this argument to be meritless inasmuch as no amount of alteration of the Appellant's claims of malpractice and fraud would overcome the Appellees' preliminary objections given the allegations made. Contrast *MacGregor v. Mediq, Inc.,* 395 Pa.Super. 221, 576 A.2d 1123, 1126 (1990).

The complaint was dismissed without affording P.C.C. any opportunity to amend, however. I must respectfully dissent.

It has long been the law to liberally grant leave to parties to amend their pleadings. Pa.R.C.P. 1028(c), 1033. *Otto v. American Mutual Insurance Co.*, 482 Pa. 202, 393 A.2d 450 (1978); *MacGregor v. Mediq Inc.*, 395 Pa.Super. 221, 576 A.2d 1123 (1990). Although the decision of whether to grant leave to amend a pleading is a matter of judicial discretion, such amendments should be allowed at any stage of the proceedings to secure a decision on the merits, unless they violate the law or unfairly prejudice the rights of the other party. *Id.*

In Pennsylvania, a suit in trespass on a theory of negligence may be maintained against attorneys where either an attorney client relationship or a specific undertaking by the attorney furnishing professional services is shown. *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983); *Lawall v. Groman*, 180 Pa. 532, 37 A. 98 (1897).

In this case, P.C.C. alleges that the Coldren firm, serving as legal counsel for an individual, a general partnership, and a corporation, each of whom are defendants in this action, drafted certain deeds for property pledged as security for the performance of certain obligations by the parties. The deeds were placed with an escrow agent on the representation that the grantor individual, Fred A. Cuteri (Cuteri), personally owned a one-half interest in the properties. The complaint further alleges that the Coldren firm had previously prepared a deed covering the same pledged property, which earlier deed transferred Cuteri's interest into a partnership. The complaint also avers that the Coldren firm had, before the execution of the escrow agreement under which the agent held the later deeds, conducted a lien search. The Coldren firm had advised P.C.C.'s counsel that they had found no mortgages indexed against any of the parties and the only liens found had nothing to do with the property to be held in escrow for the benefit of P.C.C.

Although Pennsylvania might still be thought to adhere to the traditional rule requiring privity of contract, *see Guy v. Liederbach, supra*, the facts already set forth in the complaint now before us present a classic case of negligent misrepresentation at the very least. It can be inferred from the complaint that P.C.C. would not have entered into the escrow agreement without assurances that the deeds placed in escrow were capable of conveying good title in the event the defendants failed to perform under their agreement. Where, as here, the Coldren firm secures information and transmits it to a third party, knowing that the third party will rely on it to govern its future decisions and actions, its not entirely clear that an attorney-client relationship does not exist between the Coldren firm and P.C.C. *Compare Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir.1987) (Illinois rule—one who in the course of his business or profession supplies information for the guidance of others in their business transactions is liable for negligent misrepresentations that induce detrimental reliance.)

When a lawyer at the direction of her client prepares an opinion letter which is addressed to a third party or which expressly invites the third party's reliance, she engages in a form of limited representation of that third party. *Crossland Savings FSB v. Rockwood Insurance Co.*, 700 F.Supp. 1274, 1282 (S.D.N.Y.1988). There can be no question but that the letter from the Coldren firm attached to the complaint as Exhibit H is an opinion letter. The letter states that a lien check was performed and that no liens or mortgages were found having anything to do with the property to be held in escrow. Given the allegation in the complaint that the same firm which made the lien check had prepared the earlier deed divesting Cuteri of an exclusive one-half interest in the property, it does not seem unreasonable to expect that the firm would have alerted P.C.C. to the defective title.

At the very least, I firmly believe that the plaintiff should have been afforded the opportunity to amend its complaint

in order to set forth sufficient facts to establish its claim upon which relief might be granted.

I must expressly disagree with my colleagues' emphasis on the distinction between a "lien" search and a "title" search. We here review *preliminary* objections, not an order granting or denying summary judgment. Without affording the plaintiff at least one opportunity to amend its pleading, we should refrain from speculating as to whether the Coldren firm did, or did not, do "exactly what it appears it was required to do in notifying the Plaintiff of having performed a 'lien' check of the property."

I would not be as quick as my colleagues to conclude, by way of footnote, that no amount of alteration would overcome the preliminary objections given the allegations made. Opinion, page 796 n. 5. It is not our role, on review, to fashion averments which, if included in a pleading, would render that pleading sufficient. Nevertheless, it would take little additional averments, in my judgment, to demonstrate either an attorney-client relationship or a specific undertaking. I believe the majority concedes as much. Moreover, it would not be irresponsible to revisit *Guy v. Liederbach, supra,* given the "rapidly eroding doctrine of privity." *Id.,* McDermott, J., dissenting.

The Coldren firm prepared the no-lien letter knowing its intended use. The firm had previously prepared a deed which, when recorded, operated to convert the deeds in escrow into worthless documents. The firm voluntarily assumed a relationship with P.C.C. when it issued its no-lien letter. P.C.C. should be afforded the opportunity to plead whatever additional facts are in its possession surrounding these transactions.

I would: (a) affirm so much of the order of July 9, 1990 (entered July 13, 1990) as sustained Preliminary Objections I and II of the Coldren firm, (b) reverse that portion of the order which dismissed all claims against the Coldren firm, and (c) remand for further consideration of Preliminary Objections III through VI, without prejudice to P.C.C.'s right to seek and secure amendment of the complaint fol-

lowing any subsequent order of the trial court. Hence this dissent.