## FirstSouth Savings Association v.
## Goldberg & Vergotz P.C.

C.P. of Allegheny County, no. GD95-4220.

*Ernest P. DeHaas III,* for plaintiff.
*Dennis J. Roman,* for defendants Goldberg & Vergotz.
*Joseph A. Katarincic,* for defendants Thorpe, Reed & Armstrong.

WETTICK JR., *J.,* December 15, 1999—In this lawsuit,[1] plaintiff, FirstSouth Savings Association, seeks to

1. The husband of my senior law clerk (Catherine Gerhold) works for Thorpe, Reed & Armstrong. Ms. Gerhold has had no involvement in this case.

recover losses in excess of $2.5 million that it sustained from the purchase of promissory notes from Alpine Valley Resorts, Inc. The motions for summary judgment of the Goldberg defendants (Goldberg & Vergotz P.C.; Lee Goldberg; James S. Vergotz) and the Thorpe Reed defendants (Thorpe, Reed & Armstrong; Douglas E. Gilbert) seeking dismissal of FirstSouth's claims against these defendants are the subject of this memorandum and order of court.

Alpine sold undivided ownership interests in a campground that it was developing in Fayette County, Pennsylvania. The agreement between Alpine and its purchasers is titled "Agreement for deed." The agreement for deed states that the purchaser is not purchasing the right of exclusive use of any specific campsite but only the right to use an available campsite. The agreement for deed further states that the purchaser is generally guaranteed the use of a campsite anytime during the year but on certain holiday weekends the campsites will be allotted on a first-come basis.

Usually, the purchaser made a small down payment and executed a promissory note in which he or she agreed to pay the balance in equal monthly installments over several years. The usual interest rate was 18 percent; this was an above-market interest rate. See exhibit 1 of FirstSouth exhibits in opposition to motions for summary judgment which includes (1) an agreement for deed in which Alpine sold the buyers an undivided 1/750th interest in the real estate known as phase I-B of Alpine for $5,740 with a down payment of $550 and (2) the promissory note which the purchasers executed which provided for the balance to be paid in 84 monthly payments (interest rate—18 percent).

In the agreement for deed, the purchasers agree to comply with the rules and regulations of Alpine. At the closing, they acknowledge receipt of a three-page document (FirstSouth exhibit 2, pp. 2-4) which contains the facts and regulations that apply to a phase I-B ownership interest. Paragraph 1 permits a purchaser to camp on lots only in a tent or recreational vehicle. Paragraph 2 requires Alpine to construct various recreational amenities including a restaurant, a large recreational activity center, and an indoor and outdoor heated pool. Paragraph 5 provides that Alpine will provide the campsites with water, electricity, a driveway, a picnic table, and a fire ring. Paragraph 9 provides that any recreational vehicle must be removed from the campsite if it is going to be unoccupied for seven days or more. Paragraph 14 states that the purchasers will pay an annual maintenance fee for the entire operation of Alpine, including property maintenance, security, road maintenance, water, electricity, and property taxes.

The purchasers also signed a separate real estate maintenance contract (FirstSouth exhibit 2, p. 1) in which they promised to pay an annual maintenance fee covering labor, utilities, taxes, and necessary materials and supplies.

In most instances, the consideration that Alpine received for most of the purchase price was the promissory note which the purchaser executed. Alpine and FirstSouth entered into negotiations for Alpine's sale of these promissory notes to FirstSouth. On January 5, 1988, Alpine and FirstSouth executed an agreement (FirstSouth exhibit 25) under which Alpine agreed to sell its promissory notes to FirstSouth for the face amount of the notes. These were unsecured notes (*i.e.,* not supported by any lien on the real estate). However, Alpine agreed to de-

posit into a FirstSouth reserve account 35 percent of the face amount of the note.

Shortly after the agreement was executed, FirstSouth purchased promissory notes at a face value in excess of $1.8 million. By early fall 1988, Alpine had defaulted on a substantial loan secured by a lien on the campground property, ceased providing services (including utility services and maintenance) to the campground, and was not in a position to develop the campground site. Various campground purchasers whose notes had been assigned to FirstSouth stopped making the monthly installment payments provided for under these notes. FirstSouth exhibit 32 includes five letters (dated between 10/3/88 and 10/15/88) written by counsel and a sixth written by a purchaser on advice of counsel stating in two instances that the purchasers would not make additional payments to FirstSouth until Alpine met its commitments and in four instances that the purchasers were rescinding their contracts. One of these letters written by counsel with Hyatt Legal Services stated that the agreements between Alpine and its purchasers are in violation of the Pennsylvania Goods and Services Installment Sales Act and the Unfair Trade Practices and Consumer Protection Law and demanded a refund of the money received to date and the return of all documents executed by the clients.[2]

On June 20, 1990, a purchaser, on behalf of all other purchasers, filed a class action in the Common Pleas Court of Fayette County. (Exhibit 9 of the Goldberg & Vergotz exhibits is a copy of the complaint.) In the complaint, the purchaser alleged that the transactions between

---

2. Goldberg exhibit 6 includes several additional similar letters written by or on behalf of purchasers in October 1988.

Alpine and its purchasers are governed by the Goods and Services Installment Sales Act (69 P.S. §1101 et seq.) and that under the Act the holder of the credit document is subject to all claims and defenses which the debtor may raise against the seller of the goods and services. The purchaser also raised claims against FirstSouth under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq. and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964(c).[3]

FirstSouth filed preliminary objections seeking dismissal of the class action complaint in its entirety. In an opinion and order of court dated December 10, 1990 (FirstSouth exhibit 39), the trial court sustained the preliminary objections as to the RICO claim. However, it overruled the preliminary objections seeking dismissal of claims based on the Goods and Services Installment Sales Act and the Unfair Trade Practices and Consumer Protection Law. The court ruled that the transactions between the installment purchasers of undivided interests in the campground and Alpine are governed by the Goods and Services Installment Sales Act because

"Plaintiffs purchased services within the meaning of section 1202 of the GSISA. The sale of memberships in Alpine was not realty; it was a right to use the camp-

---

3. Shortly after the lawsuit was filed, the office of the attorney general sent a letter (FirstSouth exhibit 36) to FirstSouth stating that Gallitan National Bank's foreclosure on the Alpine Valley Campground renders it impossible for the persons who purchased an interest in the resort to use and enjoy the resort as promised. The letter stated that FirstSouth holds the installment contracts subject to all claims and defenses which the debtor could assert against the seller and that the initiation of any collection activities against any purchasers who assert a defense against payment will be considered a practice violating the Unfair Trade Practices and Consumer Protection Law.

ground facilities. This same conclusion was reached by the court in *Com. ex rel. Zimmerman v. Nickel,* 26 D.&C.3d 115 (1983)." FirstSouth exhibit 39, p. 3.

The court ruled that under the provisions of this legislation, FirstSouth had stepped into the shoes of Alpine and by virtue of section 1402 is subject to all claims and defenses which the purchasers could assert against Alpine because no right of action shall be cut off by assignment.[4]

On August 25, 1992, FirstSouth settled the class action. Under the settlement agreement (FirstSouth exhibit 45), FirstSouth paid $675,000 to be distributed among the plaintiffs in the class action suit and agreed to forgive the remaining amounts owed by the class members on the promissory notes.

In the present lawsuit, FirstSouth has sued to recover the $675,000 paid pursuant to the settlement agreement, the balance forgiven by FirstSouth on the notes (an amount in excess of $850,000), lost interest on the aggregated principal balance due (an amount in excess of $650,000) and counsel fees and expenses incurred in defending and settling the class action (an amount in excess of $360,000).

In the negotiations leading to the January 5, 1988 agreement between Alpine and FirstSouth, FirstSouth was represented by the Thorpe Reed defendants and Alpine was represented by the Goldberg defendants. In this

---

4. Section 1402 reads, in relevant part, as follows:

"No right of action or defense arising out of a retail installment sale which the buyer has against the seller, other than is provided in section 1202, and which would be cut off by assignment, shall be cut off by assignment of the contract to any third party whether or not he acquires the contract in good faith and for value."

lawsuit, plaintiff has raised claims against the Thorpe Reed defendants based on this law firm's alleged failure to advise FirstSouth that there was a substantial risk that the purchasers of the undivided interests in the campground would be able to raise against FirstSouth claims and defenses which they could assert against Alpine.

FirstSouth's claims against the Goldberg law firm are based on this law firm's failure to advise FirstSouth that documents that Alpine used in its transactions with its purchasers violated the Goods and Services Installment Sales Act because the promissory notes failed to state that an assignee of the promissory notes takes the notes subject to claims and defenses that the purchasers could assert against Alpine. FirstSouth's claims against Goldberg arise out of a January 5, 1988 opinion letter that Goldberg issued (Goldberg exhibit 5) which failed to discuss the possibility that the underlying transactions between Alpine and its purchasers were governed by the Goods and Services Installment Sales Act.

## I.

I initially consider the Goldberg law firm's motion for summary judgment seeking dismissal of claims raised against this law firm.

Paragraph 5(d) of the January 5, 1988 agreement between Alpine and FirstSouth provides that FirstSouth shall not purchase any owner notes until it has received a "favorable opinion of Goldberg & Vergotz P.C., counsel for operator, in form and substance satisfactory to FirstSouth." Pursuant to Alpine's direction, the Goldberg law firm issued an opinion letter dated January 5, 1988 addressed to FirstSouth. The letter identified Goldberg & Vergotz as counsel for Alpine and Eastern Resorts

Corp. (a guarantor) in connection with the preparation, execution, and delivery of the January 5, 1988 agreement and guarantee. The letter stated that this opinion is furnished to you pursuant to section 5(d) of the January 5, 1988 agreement between Alpine and FirstSouth. The letter contained several opinions concerning matters that would have been outside the knowledge of Thorpe Reed/ FirstSouth, including (1) Alpine is a duly organized corporation in good standing under the laws of Pennsylvania; (2) the execution, delivery, and performance by Alpine of the agreement are within Alpine's corporate powers, have been authorized by all necessary corporate action and do not contravene Alpine's charter or bylaws; (3) the agreement has been duly executed on behalf of Alpine and constitutes a legal, valid, and binding obligation; (4) the execution, delivery, and performance of the agreement by Alpine does not require the consent of any trustee or holder of any indebtedness of Alpine or any other person or entity; (5) to the best of the law firm's knowledge and based on discussions with officers of Alpine, there is no pending or threatened action affecting Alpine or any of its properties which is likely to have a materially adverse effect on the financial condition or operations of Alpine; and (6) the undivided interests in real property are not securities within the meaning of the present laws of the United States or the Commonwealth of Pennsylvania and the law firm has discussed with an attorney on the staff of the Pennsylvania Securities Commission the scope of Pennsylvania's securities laws in relation to the sales operations at resort campgrounds and has been advised that the commission has taken the position that in a campground situation in which existing facilities are sold for personal use, there is no security.

FirstSouth's claims against the Goldberg law firm are not based on any opinions rendered in the January 5, 1988 letter regarding matters that would have been outside the knowledge of Thorpe Reed/FirstSouth. Instead, its claims are based on the italicized portion of the provision within the letter:

"(b) *The execution, delivery and performance by Alpine of the agreement* are within Alpine's corporate powers, have been duly authorized by all necessary corporate action, and *do not contravene* (i) Alpine's charter or bylaws, (ii) *any law,* rule or regulation *applicable to Alpine,* (iii) any contractual or legal restriction contained in any indenture, mortgage, loan or credit agreement, bond or note of Alpine or any other agreement or instrument by which Alpine is bound, or (iv) any order, writ, judgment, award, injunction of decree applicable to Alpine."

It is FirstSouth's position that the above paragraph constitutes an opinion rendered by the Goldberg law firm that the transactions between Alpine and its purchasers complied with Pennsylvania law.

FirstSouth raises three claims against the Goldberg law firm: breach of a contractual agreement between FirstSouth and the law firm; breach of a contract between the Goldberg law firm and Alpine to which FirstSouth was a third party beneficiary; and professional negligence.

There is no evidence to refute the law firm's testimony that it was never asked by Alpine or FirstSouth to render an opinion as to the applicability of the Goods and Services Installment Sales Act, as to the legality or enforcement of the promissory notes signed by Alpine's purchasers and assigned to FirstSouth, or as to whether FirstSouth would be a holder in due course.

I agree with the contention of the Goldberg law firm that the January 5, 1988 letter cannot be fairly construed as rendering any opinions concerning the legality of the documents that Alpine was using in its transactions with its purchasers or the applicability of the Goods and Services Installment Sales Act. The language upon which FirstSouth relies—"the execution, delivery and performance by Alpine of the agreement are within Alpine's corporate powers . . . and do not contravene . . . (ii) any law, rule or regulation applicable to Alpine"— refers to laws that would prevent Alpine from being bound by the January 5, 1988 agreement.

Goldberg was representing Alpine. FirstSouth was represented by separate counsel (Thorpe Reed). Thorpe Reed was fully aware of the transactions between Alpine and its purchasers and the documents that Alpine utilized. If FirstSouth was concerned with the applicability of any consumer protection laws to the underlying transactions, Goldberg would have anticipated that FirstSouth would be looking to its own lawyer rather than Alpine's lawyer for legal advice. Consequently, the opinion letter cannot be construed as addressing this issue unless the writer of the opinion letter specifically addressed the issue in the same fashion in which he addressed the applicability of federal and Pennsylvania securities laws.

Even assuming that the opinion letter could be construed as offering an opinion that the documents used in the underlying transactions between Alpine and its purchasers complied with Pennsylvania law, there is no evidence that would support a finding that FirstSouth relied on the letter. The evidence shows that Thorpe Reed was providing legal advice to FirstSouth regarding the legality of the underlying transaction and the risks that

FirstSouth may not be a holder in due course. In support of its claim against Thorpe Reed, FirstSouth presented testimony that it was looking to Thorpe Reed for its legal advice. In his deposition, Edmund M. Sanctis stated that FirstSouth was looking to Thorpe Reed to review all documents and protect FirstSouth's interests. (pp. 15, 21-22, 24-26, 37-38, 93-97.) Mr. Fitterer testified that he never relied on the opinion letter of the Goldberg law firm with respect to the legality of the underlying transactions between Alpine and the campers. In the absence of evidence to the contrary, it cannot be assumed that a party that is represented by counsel would be relying on the legal opinions of counsel representing the other party to the transaction with respect to a legal issue that its own counsel is in a position to address, particularly where other counsel represents a client that wants the transaction to go forward regardless of whether FirstSouth is subject to claims or defenses that can be raised against Alpine.

Furthermore, even if this opinion letter had stated that the underlying transaction is not governed by the Goods and Services Installment Sales Act, Goldberg raises other defenses that support the dismissal of plaintiff's complaint.

FirstSouth's breach of contract claim fails because there was no contract between Goldberg and FirstSouth. There were no communications between Goldberg and FirstSouth other than the issuance of the opinion letter. FirstSouth did not make any payments to Goldberg. FirstSouth knew that Goldberg was representing the other party to the transaction. The opinion letter was issued pursuant to Goldberg's representation of Alpine; Goldberg, acting on Alpine's behalf and for the benefit of Alpine, issued the opinion letter required under 5(d)

of the agreement in order that FirstSouth would purchase its client's notes. There was no specific undertaking to provide legal advice as to the legality of the documents used in the underlying transactions.

FirstSouth's third party beneficiary claim also fails; under Pennsylvania law, FirstSouth is not a third party beneficiary. Alpine did not intend to create a right for FirstSouth to sue the law firm that was representing Alpine. Goldberg prepared the letter in order to further Alpine's interests. The case does not involve an opinion rendered to an unsophisticated third party. In this case, the third party (FirstSouth) was represented by a law firm that participated in the drafting of the opinion letter— the January 5, 1988 agreement provided for a favorable opinion "in form and substance" satisfactory to First-South. Consequently, if the parties had intended to permit FirstSouth to bring contract claims against Alpine's law firm, Thorpe Reed would have required that this be included in the opinion letter. See generally, *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983).

Plaintiff's brief discusses *Lawall v. Groman,* 180 Pa. 532, 37 A. 98 (1897); *Pittsburgh Coal and Coke Inc. v. Cuteri,* 404 Pa. Super. 298, 590 A.2d 790 (1991), *rev'd,* 533 Pa. 311, 622 A.2d 284 (1993) (mem.) (remanded to allow plaintiff to amend the complaint); *Gregg v. Lindsay,* 437 Pa. Super. 206, 649 A.2d 935 (1994); and *Cost v. Cost,* 450 Pa. Super. 685, 677 A.2d 1250 (1996).

*Lawall* does not apply because in that case there was evidence that supported a finding that there was an understanding between the plaintiff and the lawyer who kept the plaintiff's mortgage that the lawyer would promptly record the mortgage—in other words, by keeping the mortgage the lawyer voluntarily assumed the responsibility for promptly recording the mortgage. The

court also relied on principles of tort law that impose liability on one who voluntarily undertakes certain duties for another if the party doing the undertaking knows that the other party is relying on him.

*Gregg v. Lindsay, supra,* has no precedential value because two of the three judges only concurred in the result. Furthermore, it is a will case in which the court found that there can be no recovery as a matter of law against the lawyer because the evidence did not show that the lawyer breached his duty to the client.

*Pittsburgh Coal and Coke Inc. v. Cuteri, supra,* does not apply because in that case the court found that the law firm engaged in a specific undertaking to furnish specific professional services to the plaintiff.

In the final case—*Cost v. Cost, supra*—the plaintiff did not seek a third party beneficiary status. The sole issue that the court addressed was whether an attorney malpractice claim could be pursued.

In order to recover as a third party beneficiary, the third party must show a breach of the agreement between the lawyer and the client. Consequently, plaintiff's third party beneficiary claim also fails because of the absence of any evidence showing that Alpine intended for its law firm's opinion letter to address the issue of the applicability of the consumer protection laws to the underlying transactions between Alpine and its purchasers.

The Goldberg law firm, as Alpine's counsel in this transaction, was obligated to further Alpine's interests (*i.e.,* the completion of the transaction). Consequently, the Goldberg law firm would look to Alpine to establish the scope of any opinion letter that would be furnished to FirstSouth. Unless directed to do so by its client (Alpine), the Goldberg law firm could not refer to any legal issues that might discourage FirstSouth from purchas-

ing Alpine's notes in an opinion letter to be submitted to FirstSouth.

If the evidence would support a finding that the opinion letter incorrectly represented that the underlying transactions between Alpine and its purchasers were not governed by any Pennsylvania consumer legislation, Pennsylvania law may recognize a cause of action under tort law upon a showing of justifiable reliance. See section 552 of the Restatement (Second) of Torts; *Greycas Inc. v. Proud,* 826 F.2d 1560 (7th Cir. 1987).

Any tort claim is governed by a two-year statute of limitations. FirstSouth instituted this lawsuit against the Goldberg law firm in June 1992. The wrongdoing (false representation) occurred on January 5, 1988. I will assume that the statute of limitations does not begin to run until FirstSouth suffered appreciable harm as a result of the false representations made in January 1988.

FirstSouth contends that it did not suffer harm until the December 10, 1990 Fayette County ruling in the class action lawsuit that the Goods and Services Installment Sales Act applies to the transactions between Alpine and its purchasers. I disagree. FirstSouth began sustaining losses by the fall of 1988 when purchasers were refusing to make the monthly payments provided for in the promissory notes after Alpine had breached obligations it owed the purchasers.

FirstSouth's reliance on my opinion in *Spang & Co. v. Reed Smith Shaw & McClay,* 145 P.L.J. 540 (1997), is misplaced. In *Spang,* the plaintiff did not suffer any appreciable harm until the federal court ruling because until after this ruling, Spang continued to control the pension plan and the surplus funds in the pension plan. The present case is similar to *Fiorentino v. Rapoport,* 693 A.2d 208 (Pa. Super. 1997). In that case, the court ruled

that the statute of limitations began to run when the buyer ceased making the payments specified in the stock purchase agreement because the client (whose attorney drafted an agreement that failed to protect the client's interests) suffered economic harm as of this date. *Id.* at 219-20.

FirstSouth also relies on the discovery rule. This rule provides that the limitations period does not begin to run until a plaintiff knew or should have known (1) that he has been injured and (2) that his injury has been caused by another party's conduct. *Bradley v. Ragheb,* 429 Pa. Super. 616, 621, 633 A.2d 192, 194-95 (1993). Under the discovery rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based. See *Bailey v. Tucker,* 533 Pa. 237, 252 n.15, 621 A.2d 108, 115 n.15 (1993).

In the present case, FirstSouth should have discovered more than two years before the filing of the lawsuit that the representation in the opinion letter (if made) that the underlying transaction did not violate Pennsylvania consumer laws was false. The October 1988 letter from Hyatt Legal Services stated that the agreements between Alpine and its purchasers were in violation of the Pennsylvania Goods and Services Installment Sales Act; in the letter, counsel demanded a refund of the money received to date and the return of all documents executed by the clients. As of that date, FirstSouth should have questioned the accuracy of any representation of the Goldberg law firm upon which it relied that the underlying transactions between Alpine and its purchasers complied with Pennsylvania law. With the exercise of reasonable diligence, it should have discovered that it should have been advised that there was a substantial likelihood

that the transactions between Alpine and FirstSouth were governed by the Goods and Services Installment Sales Act. See the analysis in the October 24, 1988 Thorpe, Reed & Armstrong memorandum (FirstSouth exhibit 34); also, see *Commonwealth ex rel. Zimmerman v. Nickel,* 26 D.&C.3d 115, 133-35 (1983).

I recognize that the evidence upon which FirstSouth relies shows that Thorpe Reed withheld the information within the October 24, 1988 memorandum. It is FirstSouth's position that upon receipt of the Hyatt Legal Services letter, it looked to its law firm (Thorpe Reed) which incorrectly advised FirstSouth that the Goods and Services Installment Sales Act does not apply. However, the discovery rule is not tolled because the negligence of a third party prevented plaintiff from discovering the harm and wrongdoing.

FirstSouth's claim against the Goldberg law firm is that it failed to exercise ordinary skill and knowledge because of its failure to advise FirstSouth of the potential applicability of the Goods and Services Installment Sales Act. It is FirstSouth's claim, in other words, that an attorney, exercising ordinary care, would have recognized the potential applicability of this legislation. If FirstSouth's contention is correct, it cannot contend that it was not in a position to discover the potential applicability of this legislation after receipt of the Hyatt Legal Services letter.

For these reasons, I am dismissing all claims raised against the Goldberg law firm.

I next consider the motion for summary judgment of Thorpe Reed. Thorpe Reed contends that FirstSouth's contract claims are barred by the four-year limitation period and its tort claims are barred by the two-year limitation period.

As I previously discussed, FirstSouth had sustained an "actual injury" or "harm" as of the fall of 1988 because (1) Alpine had breached its obligations to its purchasers so these purchasers were now in a position to raise against FirstSouth claims and defenses that they could assert against Alpine and (2) purchasers had ceased making payments based on Alpine's breach of its obligations owed to its purchasers. The lawsuit against Thorpe Reed was not filed until December 8, 1992, this being more than four years after FirstSouth sustained actual harm or injury because of the alleged malpractice.

As to FirstSouth's claims against the Goldberg law firm, I found that under the discovery rule the statute of limitations began to run when FirstSouth received the Hyatt Legal Services letter for the following reason: Upon receipt of this letter, FirstSouth was under a duty to use all reasonable diligence to become properly informed as to whether there was any merit to the legal positions that Hyatt Legal Services was asserting. Any attorney whom FirstSouth consulted following its receipt of the Hyatt Legal Services letter should have advised FirstSouth that there was a substantial likelihood that any holder of the notes would take subject to the claims and defenses that Alpine's purchasers could raise against Alpine.

For reasons that I will discuss, as to FirstSouth's claims against Thorpe Reed, I do not find that the statute of limitations began to run when FirstSouth received the Hyatt Legal Services letter.

Upon receipt of the Hyatt Legal Services letter, FirstSouth looked to Thorpe Reed for legal advice. The evidence most favorable to FirstSouth establishes that over the next two years FirstSouth raised two concerns with Thorpe Reed: (1) if FirstSouth sued the purchasers

to recover the money due under the notes, could the purchasers raise against FirstSouth those defenses that could be raised against Alpine and (2) whether the purchasers could raise claims against FirstSouth to recover money already paid and other damages. It appears that FirstSouth used the terminology "holder in due course" to refer to the first issue and the terminology "Goods and Services Installment Sales Act" to refer to the second issue.

After reviewing the Hyatt Legal Services letter, an attorney with Thorpe Reed authored a memorandum dated October 24, 1988. (FirstSouth exhibit 34.) The issue that the attorney addressed was whether the transactions involving Alpine and its purchasers were subject to the Goods and Services Installment Sales Act and/or the Unfair Trade Practices and Consumer Protection Law. The writer of the memorandum concluded that this legislation may apply to these transactions; thus, FirstSouth could be precluded from collecting amounts due under the notes and could be liable for damages by virtue of its relationship with Alpine.

According to the testimony most favorable to FirstSouth, Thorpe Reed never furnished to or discussed with FirstSouth this October 24, 1988 memorandum. It was not until the period between April 1989 (FirstSouth exhibit 35) and July 4, 1989 (FirstSouth exhibit 51) that Thorpe Reed advised FirstSouth that there were problems with the notes.[5] At that time, Thorpe Reed advised FirstSouth that it may not be a holder in due course because FirstSouth had known that Alpine was having serious financial difficulties that might prevent Alpine from meeting its obligations to its purchasers at the same time

---

5. Exhibit 51 is attached to plaintiff's supplemental brief in response to reply briefs of the defendants.

that it was purchasing Alpine's notes. However, until after the December 10, 1990 Fayette County Common Pleas Court ruling, Thorpe Reed continuously assured First-South that there was no merit to the legal arguments that the transactions were governed by Pennsylvania consumer protection laws that would permit the purchasers to recover damages against FirstSouth.

This lawsuit was brought within four years after Thorpe Reed advised Alpine that it may not be a holder in due course. Since FirstSouth, upon receipt of the Hyatt Legal Services letter, looked to Thorpe Reed for legal advice, Thorpe Reed cannot take the position that FirstSouth should have discovered that it was not a holder in due course at an earlier date. In addition, since Thorpe Reed allegedly concealed from FirstSouth the conclusions set forth in the October 24, 1988 memorandum, this case is governed by the case law, holding that where through concealment the defendant causes the plaintiff to relax its vigilance or deviate from its right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations. *Molineux v. Reed,* 516 Pa. 398, 402, 532 A.2d 792, 794 (1987).

Consequently, I am denying Thorpe Reed's motion for summary judgment seeking dismissal of FirstSouth's breach of contract action based on the statute of limitations defense.

I next consider the statute of limitations defense to FirstSouth's professional negligence claim. This claim is governed by a two-year limitation period.

The testimony establishes that more than two years prior to the filing of this lawsuit, FirstSouth's president knew that FirstSouth was not a holder in due course. (Radcliffe 2/10/99 deposition, pp. 87-91, 172.) Consequently, FirstSouth's claims raised in its tort action for

recovery of money that would be due under the notes if Alpine had not breached its obligations to its purchasers are barred by the statute of limitations.

FirstSouth's testimony will support a finding that until after the Fayette County ruling on December 10, 1990, Thorpe Reed continued to advise FirstSouth that the damage claims which the purchasers were raising had no merit. (Radcliffe deposition, pp. 95, 107-108.) This lawsuit was brought within two years after FirstSouth had reason to question Thorpe Reed's legal advice. Consequently, FirstSouth may pursue the claims raised in its tort action for the money paid under the settlement agreement. Plaintiffs may also seek the money spent defending and settling the class action litigation because (under the evidence most favorable to FirstSouth) these are damages which flow from an agreement that FirstSouth would have not executed if properly advised that there was a substantial likelihood that the notes that it received would not be free and clear of claims and defenses that could be raised against Alpine.

I next consider Thorpe Reed's motion for summary judgment based on the ground that the record contains no evidence of proximate cause. According to Thorpe Reed, Mr. Fitterer testified that he was prepared to complete the transaction regardless of any legal opinion that Thorpe Reed may have provided. However, I cannot rule out the possibility that FirstSouth can present expert testimony stating that Thorpe Reed attorneys failed to exercise ordinary skill and care because of their failure to furnish an opinion to the primary decision-makers within FirstSouth (FirstSouth's chairman of the board of directors, FirstSouth's president, and FirstSouth's chief financial officer) that there was a substantial likelihood that the purchasers would be able to assert against FirstSouth

claims and defenses that could be raised against Alpine and, thus, this was a risky transaction because of Alpine's poor financial status.[6]

Furthermore, the March 14, 1996 deposition testimony of Mr. Fitterer, if construed most favorably to FirstSouth, does not require (1) a finding that Thorpe Reed fully advised Mr. Fitterer of the magnitude of the risk that Alpine's purchasers may be able to raise against FirstSouth claims and defenses that could be raised against Alpine or, alternatively, that Thorpe Reed failed to fully inform FirstSouth of these risks because First-South had limited the scope of the representation or (2) a finding that FirstSouth would have completed the transaction even if advised that there was a very substantial likelihood that Alpine's purchasers would be able to raise against FirstSouth any claims and defenses that could be raised against Alpine.

Instead, this deposition testimony can be read as follows: FirstSouth informed Thorpe Reed that it wanted to promptly complete the transaction so Thorpe Reed was to focus on, negotiate over, and discuss with First-South only critical terms in the proposed agreement; FirstSouth advised Thorpe Reed that it was important that the transaction be written in a way that FirstSouth is only a lender of money in order to minimize the risks that FirstSouth would be subject to any defenses that the purchasers could raise against Alpine; and Mr. Fitterer believed that Thorpe Reed was having the documents

---

6. Radcliffe exhibit 1 (Radcliffe deposition) is a January 5, 1988 memorandum from Mr. Gilbert to the file in which he states that Alpine and the guarantor are in poor financial positions and most likely will not be able to support the totality of their obligations as now existing.

prepared in a way that minimized these risks. FirstSouth was never advised by Thorpe Reed that these risks could not be minimized because of the substantial likelihood that the underlying transactions between Alpine and its purchasers would be characterized as sales of services within the meaning of the Goods and Services Installment Sales Act. Furthermore, the testimony does not establish that FirstSouth would have completed the transaction if it had received the following legal advice: Because of the Goods and Services Installment Sales Act, there is a high probability that Alpine's purchasers may raise against FirstSouth those claims and defenses that can be raised against Alpine. Thus, if Alpine does not meet its obligations to its purchasers, the 35 percent reserve offers minimal protection to FirstSouth because FirstSouth will not recover any additional money from the purchasers and these purchasers may recover from FirstSouth any money that they paid FirstSouth. Therefore, FirstSouth should view this transaction as if it were a $2 million unsecured loan to Alpine. See generally, Mr. Fitterer's testimony at pp. 37-46, 92-104, 126-31, 137-40.

For these reasons, I enter the following order of court:

## ORDER

On December 15, 1999, upon consideration of defendants' motions for summary judgment, it is hereby ordered that:

(1) plaintiff's claims against Goldberg & Vergotz P.C., Lee Goldberg, and James S. Vergotz are dismissed;

(2) plaintiff's tort claims against Thorpe, Reed & Armstrong and Douglas E. Gilbert for recovery of amounts owed on the promissory notes that were for-

332

given pursuant to the class action settlement are dismissed; and

(3) the summary judgment motion of the Thorpe Reed defendants is otherwise denied.

(4) status conference will be held on January 10, 2000 at 10:30 a.m. o'clock.